UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
DONNA KONUCH,                     :
         Plaintiff,              :
                                 :
     v.                          :      CA 11-193 L
                                 :
MICHAEL J. ASTRUE,               :
COMMISSIONER OF SOCIAL SECURITY, :
         Defendant.             :
```

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

This matter is before the Court on the request of Plaintiff Donna Konuch ("Plaintiff") for judicial review of the decision of the Commissioner of Social Security (the "Commissioner"), denying disability insurance benefits ("DIB") under § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (the "Act"). Acting *pro se*,[1] Plaintiff has filed a motion to reverse the decision of the Commissioner. See Plaintiff's Motion to Reverse Decision of Commissioner (Docket ("Dkt.") #14) ("Motion to Reverse" or "Motion"). Defendant Michael J. Astrue ("Defendant") has filed a motion for an order affirming the Commissioner's decision. See Defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #16) ("Motion to Affirm").

---

[1] A *pro se* action is one in which the plaintiff is representing herself. Ellison v. New Hampshire Dep't of Corrections, Civil No. 07-cv-131-SM, 2007 WL 2986120, at *1 n.2 (D.N.H. Oct. 9, 2007); see also Zucker v. Westinghouse Elec., 374 F.3d 221, 227 n.5 (3rd Cir. 2004)("The term '*pro se*' is defined as an individual acting 'in his own behalf, in person.'").

This matter has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth herein, I find that the Commissioner's determination that Plaintiff is not disabled is supported by substantial evidence in the record and is legally correct. Accordingly, based on the following analysis, I recommend that Defendant's Motion to Affirm be granted and that Plaintiff's Motion to Reverse be denied.

## I.  Facts and Travel

Plaintiff was born in 1963 and was forty-three years old as of the alleged onset date of her disability. (Record ("R.") at 13, 106) She has at least a high school education, is able to communicate in English, and has past relevant work experience as a courier, customer service manager, physical education teacher, and coach. (R. at 13, 131, 133, 140)

Plaintiff filed an application for DIB on February 10, 2009, (R. at 7, 106-09), alleging disability beginning on May 12, 2006, due to a back injury and left knee injury (R. at 7, 62, 106, 132). This application was denied initially on September 15, 2009, (R. at 7, 62-64), and on reconsideration on December 17, 2009, (R. at 7, 65-68). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. at 69-74) A hearing was held on November 10, 2010, at which Plaintiff, represented by counsel, appeared and testified, as did an impartial vocational

2

expert ("VE").  (R. at 7, 20-51)

On November 30, 2010, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. at 7-14)  The Decision Review Board selected the ALJ's decision for review, but did not complete its review within the ninety days allotted for such review, thus rendering the ALJ's decision the final decision of the Commissioner.  (R. at 1-3)  Thereafter, Plaintiff filed this *pro se* action for judicial review.

## II.  Issue

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

## III.  Standard of Review

Pursuant to the statute governing review, the Court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).  Although questions of law are reviewed *de novo*, the Commissioner's findings of fact, if

supported by substantial evidence in the record,[2] are conclusive. Id. (citing 42 U.S.C. § 405(g)). The determination of substantiality is based upon an evaluation of the record as a whole. Id. (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support h[er] conclusion.")(second alteration in original)). The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "Indeed, the resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (citing Richardson v. Perales, 402 U.S. at 399.

## IV. Law

To qualify for DIB, a claimant must meet certain insured status requirements,[3] be younger than 65 years of age, file an

___

[2] The Supreme Court has defined substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); see also Brown v. Apfel, 71 F.Supp.2d at 30 (quoting Richardson v. Perales, 402 U.S. at 401).

[3] The Administrative Law Judge ("ALJ") found that Plaintiff met the insured status requirements of the Social Security Act (the "Act") through June 30, 2006. (R. at 9, 167)

application for benefits, and be under a disability as defined by the Act.  See 42 U.S.C. § 423(a).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...."  42 U.S.C. 423(d)(1)(A).  A claimant's impairment must be of such severity that she is unable to perform her previous work or any other kind of substantial gainful employment which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[4]  20 C.F.R. § 404.1521(a) (2011)[5]. A claimant's complaints alone cannot provide a basis for

---

[4] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b) (2011).  Examples of these include:

> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2)  Capacities for seeing, hearing, and speaking;
> (3)  Understanding, carrying out, and remembering simple instructions;
> (4)  Use of judgment;
> (5)  Responding appropriately to supervision, co-workers and usual work situations; and
> (6)  Dealing with changes in a routine work setting.

Id.

[5] On March 26, 2012, the text of certain sections of the C.F.R. changed.  Thus, the former § 1527(d)(1)-(6) has become § 1527(c)(1)-(6). The Court uses the format and text of the C.F.R. as it existed when Plaintiff filed her Complaint.

entitlement when they are not supported by medical evidence.  See
Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st
Cir. 1986); 20 C.F.R. § 404.1529(a) (2011).

    The Social Security regulations prescribe a five step inquiry
for use in determining whether a claimant is disabled.  See 20
C.F.R. § 404.1520(a) (2011); see also Bowen v. Yuckert, 482 U.S.
137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v. Barnhart, 276
F.3d 1, 5 (1st Cir. 2001).  Pursuant to that scheme, the
Commissioner must determine sequentially: (1) whether the claimant
is presently engaged in substantial gainful work activity; (2)
whether she has a severe impairment; (3) whether her impairment
meets or equals one of the Commissioner's listed impairments; (4)
whether she is able to perform her past relevant work; and (5)
whether she remains capable of performing any work within the
economy.  See 20 C.F.R. § 404.1520(b)-(g).  The evaluation may be
terminated at any step.  See Seavey, 276 F.3d at 4.  "The applicant
has the burden of production and proof at the first four steps of
the process.  If the applicant has met his or her burden at the
first four steps, the Commissioner then has the burden at Step 5 of
coming forward with evidence of specific jobs in the national
economy that the applicant can still perform."  Freeman v.
Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

## V.  ALJ's Decision

    Following the familiar sequential analysis, the ALJ in the

6

instant case made the following findings: 1) that Plaintiff last met the insured status requirements of the Act on June 30, 2006, (R. at 9); 2) that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of May 12, 2006, through her date last insured, (id.); 3) that through her date last insured, Plaintiff's degenerative disc disease and fusion were severe impairments, (id.); 4) that through her date last insured, Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (R. at 10); 5) that through her date last insured, Plaintiff had the residual functional capacity ("RFC") to perform less than the full range of light work, with occasional left foot operations, and had nonexertional limitations of occasional climbing of ladders, kneeling, crouching, and crawling, with the need to avoid concentrated exposure to hazards, but she could frequently climb stairs, balance, and stoop, (R. at 11); 6) that Plaintiff's medically determinable impairments could reasonably be expected to have caused the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC assessment, (id.); 7) that through her date last insured, Plaintiff was able to perform her past relevant work as a physical education teacher and that this work did not

7

require the performance of work-related activities precluded by Plaintiff's RFC, (R. at 13); 8) that, alternatively, considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy which she could perform, (id.); and 9) that Plaintiff was not under a disability, as defined in the Act, from May 12, 2006, through June 30, 2006, the date last insured, (R. at 14).

## VI.  Errors Claimed

The Court reads Plaintiff's memorandum with an extra degree of solicitude because of her *pro se* status.  See Boivin v. Black, 225 F.3d 36, 43 (1st Cir. 2000)("While pro se litigants are not exempt from procedural rules, courts are solicitous of the obstacles that they face. Consequently, courts hold pro se pleadings to less demanding standards than those drafted by lawyers.").   In her Motion, Plaintiff appears to claim that: 1) the ALJ incorrectly asserted that Plaintiff was the cause for delays in her treatment; 2) the ALJ failed to give appropriate weight to the opinions of the physicians who examined and treated Plaintiff; 3) the ALJ erroneously found that Plaintiff was not injured before her date last insured; 4) the ALJ erred in evaluating Plaintiff's activities of daily living; and 5) the ALJ's finding at Step 3 that Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, is not substantially supported by the record.

8

## VII.  Discussion

### A.    Delays in Treatment

Plaintiff's first claim of error is that the ALJ incorrectly asserted that Plaintiff was the cause for delays in her treatment. See Motion at 2.  Plaintiff does not provide a citation as to where in the administrative record this assertion by the ALJ appears, and the Court's own review of the record has failed to locate it.[6]  The only reference to delay in the ALJ's decision is contained within a discussion of Plaintiff's medical history:

> Joseph Callaghan, MD, a state agency physician, reported in September 2009 that the claimant had a history of chronic low back pain status post two lumbar disc surgeries prior to 2006 with residual chronic low back pain but with unremarkable gait and neurological examinations.  The claimant experienced trauma to the low back on May 12, 2006 with subsequent increase of symptoms including left lower extremity pain, numbness and tingling.  Exams by Dr[.] Handel on May 12, 2009 and Dr. Cyelese on January 24, 2007 showed gait was within normal limits but with TTP and decrease range of motion of the lumbar spine.  Physical examination showed (+) LSLR, (+) facet loading test and (+) Lasegue's sign.  No motor or reflex changes LEs except mild LT give way weakness and sensory changes LT Lateral leg.  MRI then and subsequently c/w collapse L5/S1 disc space with disc fragment effacing LT Si NR.  **Surgery recommended but**

---

[6] Relatedly, consideration of Plaintiff's arguments has been made more difficult because Plaintiff has cited to the administrative record by exhibit number rather than by page number.  For example, Plaintiff cites Exhibits 14F and 26F in support of a portion of her argument.  See Motion at 3-4.  These Exhibits consist, respectively, of 59 pages (R. 328-86) and 8 pages (R. at 468-75) of medical records from Kimberly J. Humulock, M.D. ("Dr. Humulock").  Plaintiff's failure to provide specific page citations to support her assertions relative to the contents of Dr. Humulock's records imposed a substantial burden on the Court.  The burden was especially heavy because Dr. Humulock's handwriting is difficult to decipher.

> **delayed until  May 19, 2008.**  Post surgery the claimant
> experienced much improvement in symptoms and was walking
> up to five miles a day until injuring left knee post-op.
> Post-operative physical examinations by Dr. Branco [sic]
> and x-rays were unremarkable except mild lower left
> extremity sensory changes as per pre-op exams.

(R. at 12)(bold added); <u>see also</u> (R. at 253, 391-92).

Assuming that the above is the reference on which Plaintiff
bases this claim of error, the Court considers her contention.
Plaintiff argues that the delay in the recommended surgery was
"caused by the procedure of the workers compensation approval
program."  Motion at 2; <u>see also</u> (R. at 206)(noting that Plaintiff
"was close to having a spinal fusion with Dr. Oyelese, but mostly
due to insurance issues ... she wound up having to cancel her
injection appointment").  She also argues that she had not failed
to attend any of her other appointments with her health care
providers.  <u>See</u> Motion at 2.

The Court sees no error by the ALJ on this issue.  First,
contrary to Plaintiff's claim, the ALJ did not find that Plaintiff
was the cause for the delay in her treatment.  Second, it does not
appear that the ALJ weighed the delay against Plaintiff in his
decision to deny her benefits.  Rather, the ALJ appears merely to
have noted the delay as part of his narrative of Plaintiff's
medical history.  Accordingly, Plaintiff's first claim of error
should be rejected.  I so recommend.

## B.  Weight Accorded to Examining and Treating Sources

Plaintiff contends that the ALJ failed to give appropriate

weight to the opinions of doctors who examined and treated her and implicitly faults the ALJ for giving greater weight to the opinions of two state agency physicians.[7]  <u>See</u> Motion at 2-3.  Evaluation of opinion evidence is governed by 20 C.F.R. § 404.1527, which provides in relevant part that:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(d)(2)(2011).  In evaluating medical opinions, an ALJ is directed to consider the existence of an examining relationship, the existence of a treating relationship, the length, nature, and extent thereof, the supportability of an opinion, the

---

[7] Plaintiff only refers to the opinion of Joseph Callaghan, M.D. ("Dr. Callaghan").  <u>See</u> Motion.  However, Dr. Callaghan's opinion was reviewed and affirmed by Henry Laurelli, M.D. ("Dr. Laurelli"), (R. at 398), and the ALJ gave the assessments of both doctors "great weight," (R. at 12).  The Court, accordingly, treats Plaintiff's Motion as arguing that the ALJ erred in giving greater weight to the opinions of these state agency physicians than to her treating and examining physicians.

consistency of an opinion with the record as a whole, the specialization of the source, and any other factors which the claimant brings to the adjudicator's attention. See 20 C.F.R. § 404.1527(d)(1)-(6).

Section 404.1527(e) states that:

Opinions on some issues, such as the examples that follow, are not medical opinions ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

(1) Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source(s), to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as ... your residual functional capacity ..., the final responsibility for deciding these issues is reserved to the Commissioner.

....

20 C.F.R. § 404.1527(e); see also Social Security Regulation ("SSR") 95-5p, 1996 WL 374183, at *2 (S.S.A.).

In order for an opinion to be afforded controlling weight, the following factors must be present: 1) the opinion must come from a treating source; 2) the opinion must be a medical opinion; 3) the

opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques; and 4) the opinion must be not inconsistent with other substantial evidence in the record. SSR 96-2p, 1996 WL 374188, at *2 (S.S.A.). Even if not afforded controlling weight, however, the opinion must be considered utilizing the factors listed in 20 C.F.R. § 404.1527. See id. at *4.

As previously noted,[8] the ALJ afforded great weight to the opinions of the state agency physicians, Joseph Callaghan, M.D. ("Dr. Callaghan"), and Henry Laurelli, M.D. ("Dr. Laurelli"). (R. at 12) Dr. Callaghan completed an RFC Assessment on September 12, 2009, which evaluated Plaintiff from May 12, 2006, the alleged onset date, to June 30, 2006, the date Plaintiff was last insured. (R. at 390-97) Dr. Callaghan found that: Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and/or pull but only to a limited degree with respect to her lower extremities, (R. at 391); climb ramps and stairs, balance and stoop frequently, and climb ladders, ropes, and scaffolds, kneel, crouch and crawl occasionally, (R. at 392). Dr. Callaghan opined that Plaintiff's allegations that she could only lift less than 10 pounds and walk 100 feet before needing to stop and rest were not

---

[8] See n.7.

13

consistent with the objective data.  (R. at 157-395)  Dr. Laurelli affirmed this RFC assessment on December 2, 2009.  (R. at 398)

Plaintiff contends that her examining and treating sources contradict Dr. Callaghan's findings.  See Motion at 2-3.  Plaintiff points first to a January 7, 2009, letter from an examining physician, Leslie Stern, M.D. ("Dr. Stern").  See id.  In particular, Plaintiff cites Dr. Stern's statements that she "was injured at work where she functioned as a teacher," Motion at 2 (quoting R. at 264), and that "the plaintiff continues to be totally disabled from performing any gainful work.  The duration of which is indefinite," Motion at 2-3 (quoting R. at 265).

As an initial matter, it bears reiterating that Dr. Stern's statement that Plaintiff "continues to be totally disabled" is an opinion on an issue reserved for the Commissioner.  Thus, it is not entitled to any controlling weight or special significance.  See 20 C.F.R. § 404.1527(e)(1).  Moreover, Dr. Stern's statements must be placed in context.  The letter was written in 2009, more than two-and-a-half years after the date Plaintiff was last insured. (R. at 264)  In it, Dr. Stern recounts Plaintiff's medical history beginning with the injury to her back in May of 2006:

> This patient was injured at work where she functioned as a teacher, when assaulted by one of her students.  At that time, she had onset of back pain with radiation of pain initially to both legs, but with residual back pain radiating to the left leg ongoing.  She was evaluated by a neurosurgeon, and work-up pursued.  She did have significant degenerative disc change at L5-S1, with evidence of a prior decompression at this level on the

14

left, and significant disc collapse. There was likely recurrent disc material and postoperative scar on the left at that level. An i.v. contrast C.T. did confirm this. The patient underwent conservative treatment without improvement. She was eventually under the care of a spine surgeon, Dr. Banco, who recommended an anterior lumbar fusion at L5-S1. This was performed in May of 2008, and subsequently, the patient has done reasonably well, with some improvement in her back pain, and fairly good relief of left leg pain. However, she continues with some degree of left posterior leg pain, which is low-level, and not worsened by physical activity, such as walking. She also continues with back pain, with stiffness in the morning. She does use occasional Oxycodone, and Motrin for this discomfort. Postoperatively, she was involved in physical therapy, and approximately one month ago, doing squats in physical therapy designed to improve her strength and mobility, she developed sudden pain in the left knee with swelling. The physical therapy has been put on hold since that time. Her physical activity in general is quite limited since then, since prior to this, she had been walking up to five miles a day.

(R. at 264-65)   As reflected in the above excerpt, Plaintiff initially underwent conservative treatment prior to having the surgery in May 2008. Following the surgery, Plaintiff's condition improved. (Id.)

The improvement is documented elsewhere in the record. Robert J. Banco, M.D. ("Dr. Banco"), another of Plaintiff's treating physicians, wrote in a June 25, 2008, treatment note: "She is six weeks from surgery and is walking five miles a day. She feels wonderful." (R. at 253)   On August 12, 2008, Dr. Banco recorded: "She has very little back pain. She gets some occasional pain in her left leg. She is walking a couple of miles a day." (R. at 312)   Notes from Coventry Physical Therapy and Sports Medicine,

Inc. ("Coventry Physical Therapy"), in the fall of 2008 reflect that Plaintiff was able to do housework, (R. at 294, 304), small loads of laundry, (R. at 300), and drive, (id.).  In fact, Plaintiff drove to New York in November of 2008.[9]  (R. at 292) Shortly thereafter, Plaintiff injured her left knee during physical therapy and her condition worsened.[10]  (R. at 310)

Thus, Dr. Stern's opinion in January 2009 takes into consideration facts postdating the date Plaintiff was last insured. His opinion is certainly not focused, as Dr. Callaghan's was, on the critical period between May 12, 2006, and June 30, 2006.  The ALJ's decision to afford more weight to Dr. Callaghan's opinion regarding Plaintiff's abilities during that period is not error.

Plaintiff next contends that the ALJ erred by giving no weight to the opinion of her treating physician, Kimberly J. Humulock, M.D. ("Dr. Humulock").  Motion at 3; see also (R. at 328-86, 468-75).  Plaintiff asserts that Dr. Humulock examined her and determined she had been unable to support herself since her back

---

[9] A November 3, 2008, note from Coventry Physical Therapy states: "Pt states she drove to New York over the wknd. Was stiff when she stopped.  Did a lot of walking.  Not too bad."  (R. at 292)

[10] Records from Coventry Physical Therapy suggest that the injury occurred on November 7, 2008.  (R. at 292)  Notes subsequent to that date reflect that Plaintiff's left knee was increasingly described as being sore, stiff, and painful. (R. 273, 277, 278, 279, 283, 284, 285, 288, 290, 291)  Her back, however, is generally described as "doing well," (R. at 283, 284, 290), "alright," (R. at 282, 285), "O.K," (R. at 293), or "not ... doing too badly," (R. at 283).  While Plaintiff sometimes complained about her back, (R. at 276, 277, 278), she told her physical therapist on March 6, 2009, that she thought her back was "bothering her because of her knee," (R. at 278).

injury in 2006.  Motion at 3.  Plaintiff further states that Dr.
Humulock "discussed the assistance the plaintiff requires in
[activities of daily living]."  <u>Id.</u>  According to Plaintiff, Dr.
Humulock "reported that the plaintiff cannot shop and carry her
groceries, cannot shower without [a] shower chair and that the
plaintiff is restricted in cooking and uses [an] extended toilet
seat in [the] bathroom."  <u>Id.</u>

As previously noted,[11] Plaintiff provides no page citation as
to where in the record these alleged statements appear, <u>see</u> <u>id.</u>,
and the Court's review of Dr. Humulock's records fails to locate
them.[12]  In addition, almost all of Dr. Humulock's records pertain
to visits by Plaintiff in 2008 and later years, long after her last
insured date.  (R. at 328-86, 468-75)  The treatment note which is
closest to that date is December 4, 2006.  (R. at 383-84)  While
the "HPI [history of present illness]," (R. at 384), section of the
note appears to state "back injury prevents her from working,"
(<u>id.</u>), the source of this statement is Plaintiff herself.  It is
not an opinion by Dr. Humulock based on "medically acceptable
clinical and diagnostic techniques."  20 C.F.R. § 404.1527.

---

[11] <u>See</u> n.6.

[12] As previously noted, <u>see</u> n.6, Dr. Humulock's handwriting is
extremely difficult to decipher.  Nevertheless, the Court spent
considerable time searching for the statements which Plaintiff claims
appear in her records.  <u>Cf.</u> <u>Holle v. Barnhart</u>, No. 01 C 50431, 2002 WL
1770535, at *10 (N.D. Ill. July 31, 2002)(finding treating physician's
opinion that plaintiff "is totally disabled" to be unsubstantiated where
treatment notes were illegible").

17

Accordingly, the ALJ did not err in affording Dr. Humulock's opinion no weight.[13]

Other evidence of record substantially supports the ALJ's assignment of weight to Dr. Callaghan's RFC assessment. The record reveals that while Plaintiff was evaluated at the Rhode Island Hospital emergency room the day she injured her back in 2006, (R. at 399-402, 404-08), she was not admitted but was sent home after being examined, (R. at 405). Emergency room records reflect that Plaintiff's pain was "mild" and that it improved. (R. at 405) The results of diagnostic imaging of her spine were reported as: "Two views of the lumbar spine demonstrate normal alignment of the vertebral bodies and posterior elements, with no evidence of fracture or subluxation. There is disc space narrowing at L5-S1.

---

[13] In point of fact, the ALJ did not mention Dr. Humulock in his decision.  However, an ALJ is not required to discuss every item of evidence in the record.  See Rasmussen-Scholter v. Barnhart, No. Civ.A. 03-11889-DPW, 2004 WL 1932776, at *10 (D. Mass. 2004)(noting that "the ALJ need not directly address every piece of evidence in the administrative record")(citing Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990)(per curiam, table decision)("An ALJ is not required to expressly refer to each document in the record, piece-by-piece"); NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999)(noting in labor context that "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted")(alteration in original)); accord Black v. Apfel, 143 F.3d at 386 (noting that "an ALJ is not required to discuss every piece of evidence submitted"); Diaz v. Chater, 55 F.3d at 308 (7th Cir. 1995)(noting that "an ALJ need not provide a complete written evaluation of every piece of testimony and evidence").  While this Court would normally expect an ALJ to discuss records from a plaintiff's treating physician, here the records are distant in time from the relevant period.  It also seems probable that the ALJ encountered the same difficulty as the Court in attempting to read Dr. Humulock's handwriting.  Accordingly, the Court does not fault the ALJ for omitting any discussion of Dr. Humulock and her records.

The paraspinal soft tissues appear normal." (R. at 406)

Plaintiff went to the Kent Hospital emergency room on May 18, 2006, at 9:35 p.m. because of back and abdominal pain, (R. at 335, 411), and was discharged the next morning at 7:07 a.m., (R. at 409-13). On that particular visit, Plaintiff reported her back pain was a five on a scale of one to ten. (R. at 415) She was told to return to the emergency room if her symptoms worsened. (R. at 411) There is no evidence in the record that she did.

In appropriate circumstances an ALJ may give greater weight to the opinions of state agency physicians than to a claimant's treating physicians. See Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d at 431 (citing Tremblay v. Sec'y of Health & Human Servs., 676 F.2d at 13 (affirming the Secretary's adoption of the findings of a non-testifying, non-examining physician and permitting those findings to constitute substantial evidence, in the face of a treating physician's conclusory statement of disability)); see also Keating v. Sec'y of Health and Human Servs., 848 F.2d at 275 n.1 ("It is within the [Commissioner's] domain to give greater weight to the testimony and reports of medical experts who are commissioned by the [Commissioner]."); SSR 96-6p, 1996 WL 374180, at *3 (S.S.A.)("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); SSR

19

96-6p, 1996 WL 374180, at *2 ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act.").

Here Dr. Stern's opinion was not only rendered remote in time from the relevant period, it also concerned an issue which is explicitly reserved to the Commissioner.  Dr. Humulock's statement in December 2006 that Plaintiff's back injury prevents her from working similarly is on a matter reserved for the Commissioner. Dr. Humulock's other records are even more distant in time from the relevant period and are largely indecipherable.  In these circumstances, the ALJ's decision to give greater weight to the opinions of Drs. Callaghan and Laurelli and less weight to the opinions of Plaintiff's examining and treating physicians was not error.

Plaintiff's second claim of error, therefore, should be rejected.  I so recommend.

### C.  Plaintiff's Injury Prior to June 30, 2006

Next, Plaintiff appears to contend that the ALJ found that she was not injured prior to the date last insured and that such finding was erroneous.  See Motion at 3.  Specifically, Plaintiff asserts that one or more medical records from Todd Handel, M.D. ("Dr. Handel"), (R. at 191-214), "contradict[] the Administrative Law Judge's findings that the plaintiff was not injured prior to

20

the date ... last insured." Id.

Contrary to Plaintiff's assertion, the ALJ did not find that Plaintiff had not sustained an injury prior to June 30, 2006.  The ALJ discussed the fact that Plaintiff had "ACL reconstruction in 1995, and ... underwent two lumbar disc surgeries twice prior to the alleged onset of disability including one lumbar microdiscectomy in 2001." (R. at 9 (citing R. at 390-97))  The ALJ explicitly noted that Plaintiff was treated at a hospital emergency department for acute back pain on May 11, 2006, the date she was assaulted by a student.  (R. at 10)  He discussed Dr. Handel's treatment of Plaintiff at considerable length, (R. at 9-10), and specifically found that through June 30, 2006, Plaintiff's degenerative disc disease and fusion were severe impairments, (R. at 9).  Thus, the ALJ was clearly cognizant that Plaintiff injured her back prior to her date last insured.

In her argument, Plaintiff appears to cite to the following portion of a June 6, 2007, report by Dr. Handel regarding one of Plaintiff's spinal injections:

> Injection at the L5-S1 level showed normal resistance with the injection of 3 cc of Omnipaque.  Ruptured tears and fissures  extended throughout the disc.  There was 9/10 pain during this injection.  This is concordant pain which reproduced her back pain.

 (R. at 211); see also Motion at 3.  After seemingly paraphrasing

the above,[14] Plaintiff asserts: "The conclusion was a concordant study which provided evidence of impairment prior to June 30[,] 2006, the date ... last insured."  Motion at 3.  In fact, the report only states: "In conclusion, this was a concordant study." (R. at 211)  The basis for the rest of Plaintiff's statement is unclear.  Moreover, the issue is not whether Plaintiff had an impairment as of June 30, 2006.  The ALJ found that she did.  (R. at 9)  The issue is whether Plaintiff was under a disability as of that date, and the Court is unpersuaded that Dr. Handel's June 6, 2007, report, which was created almost one year beyond the relevant time period, undermines the ALJ's finding that Plaintiff was not.

Accordingly, Plaintiff's third claim of error should be rejected.  I so recommend.

**D.   Evaluation of Daily Activities**

Plaintiff asserts that the information in the record about her daily activities is "incorrect," Motion at 3, "false," id., and "inaccura[te]," id. at 4.  This argument reflects a significant misunderstanding of what this Court may consider in reviewing a decision of an ALJ.  The Court's review is limited to the administrative record before the ALJ.  See Frederick v. Comm'r of Soc. Sec., No. 1:09-cv-947-HJW, 2011 WL 1114410, at *6 (S.D. Ohio Mar. 24, 2011)("Since judicial review of the administrative record

---

[14] Plaintiff refers to "L5/SI," Motion at 3, not "L5-S1," (R. at 211).

22

is limited to the ALJ's decision, which is the final decision of
the Commissioner, this Court can consider only the evidence of
record that was presented to the ALJ at the hearing for the purpose
of substantial evidence review."); Reese v. Astrue, Cause No. 1:07-
cv-1663-WTL-JMS, 2009 WL 499601, at *8 (S.D. Ind. Feb. 27, 2009).
The Court may not receive or consider new evidence.  See id.  Thus,
to the extent that Plaintiff seeks by her Motion to correct
evidence in the present record, the Court may not consider it.  The
Court's task is limited to determining whether there is substantial
evidence in the record which supports the ALJ's findings.

The Court reproduces below the ALJ's discussion of Plaintiff's
activities of daily living, inserting the citations to the record
which support the ALJ's statements:

> The claimant testified that she napped once a day for 1-2
> hours [R. at 29], longer naps after physical therapy
> [id.].  She further testified that she was able to dress
> [R. at 24], cook and prepare meals [R. at 25], grocery
> shopped [id.], carried light bags [id.], used dishwasher
> [id.], occasionally put wash in machine [id.], and was
> able to drive [R. at 26].  The claimant stated her left
> foot was numb since she had surgery and that it caused
> her difficulty using stairs, more so going down stairs
> than up [id.].
>
> ....
>
> Although the claimant has limitations secondary to his
> [sic] physical and emotional impairments, they are not of
> the severity he [sic] alleges.  The record establishes
> the claimant is able to perform personal hygiene and
> grooming [R. at 24-25, 154].  She did not allege any
> difficulty in handling household finances [R. at 155-56].
> In [a] form completed in the process of applying for
> disability benefits in April 2009, the claimant reported
> that she prepared meals [R. at 154], fed her pets [R. at

23

153], and went outside on a daily basis [R. at 155].  She was able to go out alone without assistance and drove a car [id.].  She shopped [id.[15]].  The claimant read and watched television [R. at 156].  She talked on the phone with others and attended mass on a daily and/or weekly basis [id.].  The claimant reported that she could follow written and spoken instructions well without any problems [R. at 158].  She got along with authority figures very well [id.]; and handled changes in routine and stress well [id.].  The claimant testified that she was able to dress, cook and prepare meals, grocery shopped, carried light bags, used dishwasher, occasionally put wash in machine, and was able to drive [R. at 24-25].  The claimant's description of daily activities is consistent with an individual who lives independently and adequately maintains a household.

(R. at 11-12)

Plaintiff asserts that the ALJ is incorrect in stating that she is capable of performing personal hygiene and grooming.  Motion at 3.  She asserts that she has been using bathroom aids (shower chair, extended toilet seat) since the onset of injury.  Id.  She further states that she requires assistance in the shower and is severely limited in walking.  Id.  However, as evidenced by the above annotations, the ALJ's findings regarding Plaintiff's daily activities are supported by the record.  Plaintiff testified at the hearing that she was able to dress herself, (R. at 24), and shower, although she sometimes needed assistance to shave her legs,

---

[15]  In the form, Plaintiff indicated with a check mark that she shopped in stores.  (R. at 155)  Beneath the check mark, in response to questions asking what she shopped for and how often, Plaintiff wrote: "I go to the grocery store on occasion, but I have someone who usually does this for me[,]" (id.), "I don't really shop, but I pay my bills at the retail stores in person," (id.).  Plaintiff's explanatory statements do not undermine the conclusion that Plaintiff is able to go to stores and engage in transactions there.

(R. at 24-25).  This essentially was consistent with what she indicated in her April 5, 2009, function report.  (R. at 153)

Plaintiff asserts that it is "false" that she prepared meals and went outside on a daily basis.  Motion at 3.  Yet, the ALJ's finding to that effect, (R. at 12), is directly supported by the April 5, 2009, function report in which Plaintiff stated that she prepared meals "daily," (R. at 154), and went outside "daily," (R. at 155).

Plaintiff complains that Dr. Callaghan referenced statements in the function report but that these statements (made by Plaintiff) contained "inaccuracies."  Motion at 4; see also (R. at 390-97).  Plaintiff does not identify any specific "inaccuracies" appearing in the RFC completed by Dr. Callaghan, and she does not provide a citation to the page on which they may be found.  Id. at 3-4.  In deference to her pro se status, the Court will overlook these omissions and address as best it can Plaintiff's argument.

Plaintiff indicates that in completing the function report she stated information about her daily activities "during that time period," Motion at 4, when she was attending physical therapy three times a week, id.  Plaintiff also complains that some answers were taken out of context.  Id.  She states that her reference to going outside "refer[red] to sitting on the deck," id., and that she "has

25

limited driving ability ... and cannot drive for long distances,"[16] id. As previously noted, this Court's review is confined to the record before the ALJ, and it may not consider new evidence. Plaintiff's explanation or qualification of information she previously provided cannot be a basis for finding that the ALJ's decision is not supported by substantial evidence or that he erred.

Plaintiff argues that medical records from Dr. Humulock, (R. at 328-86, 468-75), Henry M. Toczylowski, M.D. ("Dr. Toczylowski"), (R. at 268-69, 444-48), and Coventry Physical Therapy, (R. at 451-67, 476-98, 499-506), "contradict the statement from Dr. Callaghan," Motion at 4. Again, Plaintiff does not identify any specific statement by Dr. Callaghan which she contends is contradicted by these medical records. Id. The Court will, therefore, assume Plaintiff contends that the records contradict the entire RFC assessment made by Dr. Callaghan.

With respect to Dr. Humulock's records, in addition to being extremely difficult to decipher, they pertain almost entirely to Plaintiff's condition long after her date last insured. Similarly, Dr. Toczylowski first saw Plaintiff on April 3, 2009, almost three years after Plaintiff's last insured date.[17]  (R. at 268)  Also

---

[16] On July 22, 2010, Plaintiff's therapist at Coventry Physical Therapy recorded: "Patient reports that she was in and out of the car yesterday for around 2 hours.  Patient reports she is sore today."  (R. at 497)

[17] Plaintiff sought treatment from Dr. Toczylowski because of "pain and instability in her left knee," (R. at 268), which had become "significantly unstable," (id.), following the injury during physical

similarly, the earliest treatment note from Coventry Physical Therapy is dated August 25, 2008, more that two years after Plaintiff's date last insured.  (R. at 307)

Furthermore, the medical records from Dr. Humulock, Dr. Toczylowski, and Coventry Physical Therapy, do not actually contradict Dr. Callaghan's RFC assessment.  To the extent that the records address Plaintiff's physical capabilities and daily activities, they do so for time periods long after June 30, 2006. In contrast, Dr. Callaghan's RFC assessment addresses Plaintiff's limitations from the alleged onset date to June 30, 2006.  (R. at 390)

In addition, Dr. Humulock's alleged medical treatment note which Plaintiff claims contains the restrictions of her activities of daily living, including an inability to shop for or carry groceries, an inability to shower without a shower chair, limitations in cooking, and use of an extended toilet seat in the bathroom, <u>see</u> Motion at 3, is nowhere to be found in the record. Plaintiff herself reported similar limitations in a function report, but this is dated April 5, 2009, and is outside of the relevant time period.  (R. at 152-59)

Thus, the ALJ's evaluation of Plaintiff's daily activities is supported by substantial evidence in the record.  Accordingly, the Court finds that this claim of error should be rejected.  I so

therapy in November 2008.

recommend.

**E.  The ALJ's Step 3 Finding**

As noted above, the ALJ found that Plaintiff did not have an impairment or combination or impairments that met or medically equaled one of the listed impairments in Part 404, Subpart P, Appendix 1, of 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526. (R. at 10)  Plaintiff argues that the ALJ committed error in so finding.  See Motion at 4-5.  Plaintiff appears to assert that the ALJ erred in finding that her back impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1.[18]  Id.  Specifically, Plaintiff alleges that she suffered loss of function due to her spinal stenosis, including inability to ambulate effectively due to pain.  Id.[19]

---

[18] Plaintiff was represented by counsel at the hearing before the ALJ.  The record is devoid of any indication that Plaintiff advanced the contention that her condition met or equaled one of the listings.

[19] Plaintiff in her Motion states that she:

has the loss of function due to bone or joint deformity and disorder of the spine with radiculopathy and neurological deficits requiring prolonged periods of immobility or convalescence.  [F]unctional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment.  Based on the records of the surgeons and therapists, the plaintiff cannot perform any work.  In fact she is still currently receiving Lumbar Caudal epidural injections.

The plaintiff has suffered loss of function due to multiple disorders of the spine and has the inability to ambulate effectively on a sustained basis.  The plaintiff

Subpart P, Appendix 1, § 2(B)(2)(a) of 20 C.F.R. Part 404

provides in relevant part:

> [F]unctional loss for purposes of these listings is
> defined as the inability to ambulate effectively on a
> sustained basis for any reason, including pain associated
> with the underlying musculoskeletal impairment, or the
> inability to perform fine and gross movements effectively
> on a sustained basis for any reason, including pain
> associated with the underlying musculoskeletal
> impairment. The inability to ambulate effectively or the
> inability to perform fine and gross movements effectively
> must have lasted, or be expected to last, for at least 12
> months .... We will determine whether an individual can
> ambulate effectively or can perform fine and gross
> movements effectively based on the medical and other
> evidence in the case record ....

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2(B)(2)(a). Inability to

ambulate effectively is defined as:

> (1) ... an extreme limitation of the ability to walk;
> i.e., an impairment(s) that interferes very seriously
> with the individual's ability to independently initiate,
> sustain, or complete activities. Ineffective ambulation
> is defined generally as having insufficient lower
> extremity functioning ... to permit independent
> ambulation without the use of a hand-held assistive
> device(s) that limits the functioning of both upper
> extremities ....

> (2) To ambulate effectively, individuals must be capable
> of sustaining a reasonable walking pace over a sufficient
> distance to be able to carry out activities of daily
> living. They must have the ability to travel without
> companion assistance to and from a place of employment or
> school. Therefore, examples of ineffective ambulation
> include, but are not limited to, the inability to walk
> without the use of a walker, two crutches or two canes,
> the inability to walk a block at a reasonable pace on

---

cannot ambulate without the use of a cane and cannot lift or
carry objects because of this.

Motion at 4-5.

29

rough or uneven surfaces, the inability to use standard
public transportation, the inability to carry out routine
ambulatory activities, such as shopping and banking, and
the inability to climb a few steps at a reasonable pace
with the use of a single hand rail.  The ability to walk
independently about one's home without the use of
assistive devices does not, in and of itself, constitute
effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2(B)(2)(b)(1-2).

The ALJ accurately noted that "no source opined the claimant met a listing." (R. at 10)  In addition, there was evidence in the record that Plaintiff was able to ambulate effectively on a sustained basis as required by the above regulation.  Plaintiff herself indicated that she was able to shop and go to stores to pay bills.  (R. at 155)  Dr. Callaghan's RFC Assessment reflects that Plaintiff was able to stand and/or walk about 6 hours in an 8-hour workday.  (R. at 391)  He specifically found that Plaintiff's claim that she could only walk 100 feet and lift and/or carry less than 10 pounds "are not consistent with objective data from [alleged onset date] to [date last insured]." (R. at 395)  In addition, he found that Plaintiff was capable of light work activity with occasional left foot operations, frequent climbing of stairs, balancing and stooping, as well as Plaintiff's nonexertional limitations of occasional climbing of ladders, kneeling, crouching, and crawling.  (R. at 12, 391-94)  Clearly, Dr. Callaghan believed Plaintiff could effectively ambulate on a sustained basis.  Lastly, the record does not contain any mention of Plaintiff's need for a cane as she alleges.  See Motion at 5.

Plaintiff has the burden at Step 3 to prove she meets or medically equals one of the listings. See Freeman v. Barnhart, 274 F.3d at 608.  Substantial evidence supports the ALJ's implicit determination that Plaintiff failed to meet her burden at Step 3. In particular, this Court, evaluating Plaintiff's allegation under disorders of the musculoskeletal system, finds that substantial evidence supports the ALJ's finding, (R. at 10), that Plaintiff did not meet the requirements of the listing during the relevant time period.

Accordingly, Plaintiff's final claim of error should be rejected.  I so recommend.

### Summary

The issue in this case is whether substantial evidence supports the ALJ's finding that Plaintiff was not under a disability prior to her date last insured of June 30, 2006.  That finding is supported by the opinion of two state agency physicians, and it was not error for the ALJ to give greater weight to their opinions than to the opinions of Plaintiff's treating and examining physicians.  The latter opinions were generally rendered long after Plaintiff's date last insured and took into consideration subsequent events, including an injury to her left knee in November of 2008.  Prior to that injury (but after June 30, 2006), Plaintiff had been walking up to five miles a day and was able to drive to New York.

Contrary to Plaintiff's claim, the ALJ did not assert in his decision that Plaintiff was the cause for delays in her treatment. Plaintiff is also mistaken in her assertion that the ALJ found that she had not been injured prior to the expiration of her insured status on June 30, 2006. Substantial evidence supports the ALJ's evaluation of Plaintiff's daily activities, and the Court may not consider statements from Plaintiff which seek to alter or augment evidence in the record. Finally, the ALJ's finding that Plaintiff did not have a impairment that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526) is supported by substantial evidence. Accordingly, Plaintiff's claims of error should be rejected. I so recommend.

## Conclusion

The Court finds that the ALJ's determination that Plaintiff is not disabled within the meaning of the Act is supported by substantial evidence in the record and is legally correct. Accordingly, I recommend that Defendant's Motion to Affirm be granted and that Plaintiff's Motion to Reverse be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and

of the right to appeal the district court's decision.   See <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ David L. Martin</u>
DAVID L. MARTIN
United States Magistrate Judge
September 13, 2012

33